# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| DEBRA ANDRE, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No. 18-142-VAC-CJB |
| DOLLAR TREE STORES, INC., | ) ) ) |  |
| Defendant. | ) |  |

## **MEMORANDUM ORDER**

Presently pending in this employment discrimination matter is Defendant Dollar Tree Stores, Inc.'s ("DTS" or "Defendant") Motion to Compel Arbitration, (D.I. 4) (the "Motion to Compel"). For the reasons set forth below, the Court DENIES the Motion to Compel without prejudice and ORDERS the parties to proceed through limited discovery consistent with this opinion.

## I. BACKGROUND

### A. **Factual Background**

#### 1. **The Parties**

Plaintiff Debra Andre[1] is a resident of Dover, Delaware. (D.I. 1 at ¶ 1) Defendant Dollar Tree Stores, Inc. is a Virginia corporation that operates thousands of retail stores across the nation, in which various retail products are sold. (*Id.* at ¶ 2; D.I. 6 at ¶ 3)

---

[1] Plaintiff's Complaint indicated that Plaintiff's name is spelled "Deborah Andre." (D.I. 1) Accordingly, the Court's ECF system uses that spelling of Plaintiff's name in the caption. In their briefing, however, both parties note that Plaintiff's first name is spelled "Debra," and they go on to use that spelling in their papers. (D.I. 4; D.I. 5; D.I. 8) The Court will use the correct spelling of Plaintiff's name in this Memorandum Order. The Court will also *sua sponte* amend the case caption to reflect the correct spelling of Plaintiff's first name. *See Sharp v. Verizon Del. LLC*, Civil Action No. 11-1209-RGA-CJB, 2014 WL 350089, at *1 n.1 (D. Del. Jan. 31, 2014).

Plaintiff was most recently employed by Defendant as Assistant Manager at Defendant's retail store #1563, which is located in Dover. (D.I. 1 at ¶ 11; D.I. 5 at 1) Plaintiff was employed by Defendant from on or about September 2011 until on or about June 30, 2016, at which point she was terminated. (D.I. 1 at ¶ 12; D.I. 5 at 1-2)

### 2. The Events Leading to Plaintiff's Termination

In her Complaint, Plaintiff alleges that in March 2016, a new Store Manager, Chris Stewart, was assigned to oversee the DTS store where Plaintiff served as Assistant Manager. (D.I. 1 at ¶ 14) Approximately two months after Mr. Stewart began working at Plaintiff's assigned store, Plaintiff received complaints from female and male employees at the store about Mr. Stewart; the employees asserted that Mr. Stewart made sexual remarks about them or about other workers. (*Id.* at ¶ 15) Plaintiff then notified (via e-mail) District Manager Marcella Leathern about the complaints, but Plaintiff did not receive a response. (*Id.* at ¶¶ 16-17)

Approximately a week and a half after Plaintiff sent the e-mail to Ms. Leathern, at a time when Plaintiff was bent over stocking shelves with another co-worker, Mr. Stewart is alleged to have grabbed Plaintiff's waist from behind and pulled Plaintiff into his groin while making sexual remarks. (*Id.* at ¶ 18) Plaintiff again e-mailed Ms. Leathern complaining about Mr. Stewart's conduct, but once again, Plaintiff did not receive a response from Ms. Leathern. (*Id.* at ¶¶ 19-20)

Approximately two days later, Plaintiff was in a store office when Mr. Stewart reached towards Plaintiff and grabbed her buttocks, at which point Plaintiff forcibly pushed Mr. Stewart away. (*Id.* at ¶ 21) Plaintiff once more e-mailed Ms. Leathern complaining about Mr. Stewart's conduct but did not receive a response. (*Id.* at ¶¶ 22-23) Plaintiff then reported this incident to "numerous Human Resource personnel." (*Id.* at ¶ 24)

Approximately one week later, Plaintiff was called into work on her day off to meet with Ms. Leathern regarding Mr. Stewart's conduct. (*Id.* at ¶ 26) Ms. Leathern explained to Plaintiff that if Plaintiff had provided inaccurate facts to Defendant about Mr. Stewart's conduct, then Plaintiff's employment would be terminated. (*Id.* at ¶ 27)

On another work day in this general time frame, Plaintiff was scheduled to work a 5.5 hour shift. (*Id.* at ¶ 31) Plaintiff alleges that during this shift she was notified by Mr. Stewart that he was going to be late for work. (*Id.*) Defendant's policy states that an employee will be reprimanded if they do not take a lunch break after six hours of work. (*Id.* at ¶ 30) Realizing that because Mr. Stewart was going to be late for work, this would mean that Plaintiff would be required to work for over six hours on that day, Plaintiff took a 32-minute lunch break on that day. (*Id.* at ¶¶ 29, 31)

On June 30, 2016, Plaintiff was terminated for taking this "unscheduled lunch break." (D.I. 1 at ¶¶ 12, 33; *see also* D.I. 5 at 2) Plaintiff contends that this reason proffered by Defendant for her firing (i.e., that Plaintiff was fired because she took the unscheduled lunch break) is pretextual; instead, Plaintiff asserts that she was really terminated due to discriminatory and retaliatory conduct on the basis of her sex, stemming from the incidents described above regarding Mr. Stewart. (D.I. 1 at ¶ 35)

### 3. The Arbitration Agreement

During the term of Plaintiff's employment, in 2014, Defendant implemented its Arbitration Program. (D.I. 6 at ¶ 4; D.I. 5 at 2) Pursuant to the program, each DTS Associate was required to read the corresponding materials, including the Mutual Agreement to Arbitrate Claims (hereinafter, the "Arbitration Agreement"). (D.I. 6 at ¶¶ 5-6; *id.*, ex. 3) The Arbitration Agreement provides, *inter alia*:

3

> The Parties agree to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, that can be raised under applicable federal, state, or local law, arising out of or related to Associate's employment (or its termination), that . . . the Associate may have against . . . Dollar Tree . . . . Claims subject to arbitration include but are not limited to, claims for: . . . retaliation or discrimination (including, but not limited to, . . . sex . . . .)[.]

(D.I. 6, ex. 3 at 1) Moreover, the Arbitration Agreement provides that it survives the termination of an associate's employment and that it constitutes the full and complete agreement pertaining to the formal resolution of disputes between parties. (*Id.* at 4)

All associates hired on or after October 6, 2014 were required to participate in the Arbitration Program as a condition of their employment. (D.I. 6 at ¶ 4) However, all associates hired before October 6, 2014 (like Plaintiff) were provided the option of opting out of the Arbitration Program by submitting an Opt-Out Form either electronically or by mail, prior to May 31, 2015. (*Id.*; *see also id.*, ex. 3 at 4) The Opt-Out procedure was set out in the Arbitration Agreement, which stated that "**Associate must opt out by May 31, 2015. Associate's decision not to opt out by May 31, 2015 constitutes Associate's assent to, and agreement to be bound by, this Agreement.**" (D.I. 6, ex. 3 at 4 (emphasis in original))

According to Defendant, its records establish that: (1) Plaintiff electronically accessed the information regarding DTS's Arbitration Program, including the Arbitration Agreement, on April 6, 2015; and (2) on that same date, an electronic acknowledgement was generated indicating that Plaintiff had received access to the Arbitration Agreement and other related materials. (*Id.* at final page; *see also* D.I. 6 at ¶ 12) An affidavit submitted by Steven Pearson, Defendant's Field Labor and Budget Director, explains that "each Associate [accessing DTS's arbitration website] was required to input his or her name, the last 4 digits of his or her [S]ocial [S]ecurity [N]umber, his or her time clock ID number, his or her store number, and his or her

4

work address." (D.I. 6 at ¶ 7; *see also id.*, ex. 6) According to Mr. Pearson, once these credentials were submitted, a "pop-up box" appeared, stating that by clicking on the "Review Documents" button, the Associate was acknowledging that they had been provided with access to the Arbitration Agreement, opt-out instructions, and other important information about arbitration. (D.I. 6 at ¶ 8; *see also id.*, ex. 7) After clicking a further "Continue" box, the Associate would be directed to DTS's "Arbitration home page"—a page with links to, *inter alia*, the Arbitration Agreement and opt out forms. (D.I. 6 at ¶ 9; *see also id.*, ex. 8) Attached to Mr. Pearson's affidavit is a document that Mr. Pearson states is a "true and accurate copy of Plaintiff's electronically signed acknowledgement of the Arbitration Agreement, and consequently, her agreement to be bound by the same[.]" (D.I. 6 at ¶ 12; *see also id.*, ex. 3) That one-page document (the "acknowledgement") reads as follows:

> You [debra andre] electronically acknowledged on 04/06/2015 that Dollar Tree gave you the opportunity to read the Arbitration Agreement and other important information relating to Dollar Tree's arbitration program.
>
> Store Number: 01563
> Work Address:
> City: dover
> State: DE
> Zip Code: 19901

(D.I. 6, ex. 3) Furthermore, Mr. Pearson avers that Defendant "has no record of Plaintiff ever opting out of the Arbitration Agreement by the May 31, 2015 deadline (or at any other time)" and that Plaintiff "did not opt out of the Arbitration Agreement electronically or by mail, per the written instructions." (D.I. 6 at ¶ 14)

In opposing DTS's motion, Plaintiff filed an affidavit of her own. (D.I. 8, ex. A) In that affidavit, Plaintiff states that she did not, in fact, have an opportunity to read and review the Arbitration Agreement or any opt-out forms that were posted in her employee electronic file.

5

(*Id.* at ¶ 3) Instead, Plaintiff contends that any employees who had access to the Manager's Office at the DTS store where she worked also had access to a book containing employee passwords; this access, according to Plaintiff, gave such employees access to Plaintiff's electronic employment files. (*Id.* at ¶ 4) For example, Plaintiff asserts that a former Assistant Manager at the store, Sandy Ruiz, frequently accessed Plaintiff's employee electronic account so that Ms. Ruiz could perform surveys and tests for Plaintiff, instead of Plaintiff personally completing those surveys and tests. (*Id.*) Plaintiff explains that Ms. Ruiz did this because the Store Manager felt it would be more productive for Plaintiff to be on the store floor, instead of taking the time out of her work day to complete these computer-based tasks. (*Id.*) Plaintiff asserts "any number of persons could have and probably did go into [her] employee electronic file and may have clicked on any number of items posted by Defendant, including . . . the [A]rbitration [A]greement . . . ." (*Id.* at ¶ 5) Plaintiff further states that "[she] did not actually look at or review items posted by Defendant in [her] employee electronic file either online or in person, including . . . the [A]rbitration [A]greement and any opt-out form." (*Id.*)

### B. Procedural History

On January 25, 2018, Plaintiff filed this action, alleging that DTS subjected her to sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (D.I. 1 at ¶¶ 6, 34-36) In response, on February 15, 2018, Defendant filed its Motion to Compel, which was fully briefed on March 8, 2018. (D.I. 9) With the Motion to Compel, Defendant asks that the Court: (1) compel Plaintiff to arbitrate the claims she asserts in this action; and (2) stay the case pending arbitration. (D.I. 5 at 1)

## II. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), which governs the Arbitration Agreement in question here, was enacted by Congress in 1925 to quell historical judicial hostility toward the enforcement of arbitration agreements. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12 (2001); *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177-78 (3d Cir. 2010). The United States Court of Appeals for the Third Circuit has "repeatedly recognized that the [FAA] establishes a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 200 (3d Cir. 2010) (quoting *Puleo*, 605 F.3d at 178).

Pursuant to Section 3 of the FAA, a court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. Section 3, thus, "requires the court, on application of one of the parties [to the litigation], to stay the action if it involves an issue referable to arbitration under an agreement in writing." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (internal quotation marks and citation omitted); *see also Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he statute clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until the arbitration has been concluded.").

However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). Therefore, a party may not be compelled under the FAA to submit to arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original). Thus, in deciding

7

whether to compel arbitration under the FAA, a court first considers (1) whether there is a valid arbitration agreement between the parties, and if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement. *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998).

With respect to the first inquiry (or "step one"), courts apply "ordinary state-law principles that govern the formation of contracts." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009); *see also Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 500 (D. Del. 2010). In examining this question, if the affirmative defense of arbitrability is apparent on the face of the complaint (or documents relied upon therein), a court utilizes "a motion to dismiss standard without the inherent delay of discovery[.]" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) (internal quotation marks and citation omitted). If, however, the complaint does not establish on its face an agreement to arbitrate, or if the party opposing the motion to compel arbitration thereafter comes forward with "reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement" in question, then a court utilizes a summary judgment standard to resolve the issue. *Id.* (internal quotation marks and citation omitted).[2] In utilizing the summary judgment standard, a court assesses whether there is a genuine issue of material fact as to whether the parties entered into such an arbitration agreement, and, in doing so, gives the

---

[2] The use of a summary judgment standard in such scenarios is appropriate because an order compelling arbitration in this context is "in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Century Indem. Co.*, 584 F.3d at 528 (internal quotation marks and citation omitted).

8

opposing party the benefit of all reasonable doubts and inferences that may arise. *Id.*; *see also Vilches v. Travelers Cos.*, 413 F. App'x 487, 490-91 (3d Cir. 2011).

If a complaint does not itself establish an agreement to arbitrate, or if the non-movant has come forward with reliable evidence that calls into question whether it intended to be bound by an arbitration agreement, then the "non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (internal quotation marks and citations omitted). If limited discovery is provided, the court may thereafter entertain a renewed motion to compel arbitration, judging the motion under the applicable summary judgment standard. *Id.* at 776. If a genuine issue of material fact does then exist as to whether there was an agreement to arbitrate, this precludes the grant of a motion seeking to compel arbitration. *Id.*; *Century Indem. Co.*, 584 F.3d at 528. A trial is then required to determine whether an arbitration agreement exists. *Guidotti*, 716 F.3d at 776; *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007); *see also* 9 U.S.C. § 4. On the other hand, if at this stage a determination as to whether an agreement to arbitrate was formed will not turn on disputed issues of fact (and instead only "involves contract construction" issues), the Court simply then makes a legal determination, using the aforementioned state law principles. *Century Indem. Co.*, 584 F.3d at 528-30.

With regard to the step two question—whether the dispute between the parties falls within the scope of the valid arbitration agreement—the court utilizes federal law. *Id.* at 524. Pursuant to the FAA and federal policy, there is a presumption in favor of arbitration "[i]n determining whether the particular dispute falls within a valid arbitration agreement's scope[.]" *Id.*; *see also Cohen*, 750 F. Supp. 2d at 501. Thus, an "'order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is

9

not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT&T Techs., Inc.*, 475 U.S. at 650).

## III. DISCUSSION

In challenging the Motion to Compel, Plaintiff's sole argument relates to step one of the inquiry described above—that, pursuant to Delaware contract law, no valid arbitration agreement exists here between the parties. As to that question, the parties clearly have threshold factual disputes about: (1) whether Plaintiff ever accessed or reviewed the Arbitration Agreement; (2) whether Plaintiff is the person who provided the electronically signed acknowledgement that, according to Defendant, indicates an agreement to be bound by the terms of the Arbitration Agreement; and (3) relatedly, whether Plaintiff ever knew of her ability to opt out of the Arbitration Agreement. (D.I. 5 at 2-3; D.I. 8 at 1; *id.*, ex A at ¶¶ 3, 5)

On this score, Defendant argues that on or before April 6, 2015, Plaintiff electronically accessed the Arbitration Agreement on Defendant's "specific arbitration website[,]" which detailed the opt-out procedures.[3] (D.I. 9 at 1-2) Defendant points to the existence of the acknowledgement as proof of the fact that Plaintiff did, in fact, access the website containing the Arbitration Agreement. (*Id.* at 2) And since Defendant has no record of Plaintiff having opted out of the Arbitration Agreement by the May 31, 2015 deadline, Defendant argues that Plaintiff should be compelled to arbitrate her claims. (*Id.*)

But Plaintiff responded by citing to facts that call into question whether she ever accessed the website containing the Arbitration Agreement and the opt out procedures (and, indeed, whether she ever knew of the existence of the Arbitration Agreement in the first place). That is,

---

[3] Since Plaintiff was employed by DTS prior to the October 6, 2014 cut-off date, she was an eligible associate who could choose to opt out of the arbitration agreement.

Plaintiff, *inter alia*, asserts that she "never accessed the website [containing the Arbitration Agreement]" and thus, there is "no contract to arbitrate." (D.I. 8 at 6; *see also id.* at 1 ("[A]t no time did Plaintiff affirmatively assent to be bound by the arbitration agreement[.]"); *id.* at 3) Plaintiff relies on her affidavit in support of this contention. In that affidavit, Plaintiff not only asserts that she never read or reviewed the Arbitration Agreement, but she also contends that another store employee "could have and probably did" use certain of Plaintiff's identifying information to access the arbitration website and "click[] on" any relevant boxes, such as the one that generated the acknowledgement. (*Id.*, ex. A at ¶¶ 3, 5)[4]

In light of the above, the correct path for the Court would seem to be pretty clear. Pursuant to Third Circuit law, (1) because the Complaint and its supporting documents say nothing about whether Plaintiff agreed to arbitrate these disputes, and (2) because Plaintiff has responded to the pending motion with an affidavit citing additional facts that place the agreement to arbitrate in issue, then (3) the Court should allow discovery on the question of arbitrability before entertaining a renewed Motion to Compel from Defendant. *Guidotti*, 716 F.3d at 776; *see also Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017).

---

[4] Plaintiff does argue in the alternative that, even if she is found to have logged into Defendant's arbitration website and to have gained access to the Arbitration Agreement, her failure to opt out of the Arbitration Agreement is unavailing because she "never agreed to be bound" by that agreement, never read the agreement, never understood the agreement, and in no "way assented to the agreement." (D.I. 8 at 3; *see also id.* at 4-6) Defendant argues to the contrary that "Plaintiff affirmatively consented to arbitration when she accessed the arbitration website and specifically clicked to confirm[] that all of the materials and information were made available to her including the opt-out information, and then failed to opt out by the specified date, confirming her agreement to be bound." (D.I. 9 at 2-3) Because Plaintiff does not articulate any material disputed fact issues (other than about whether Plaintiff, in fact, is the person who accessed Defendant's arbitration website and electronically acknowledged receipt of the Arbitration Agreement and other relevant documents, a subject otherwise addressed in this Memorandum Order) that are relevant to this disagreement regarding the requirements of Delaware contract law, the Court need not discuss that issue further here.

Defendant, however, argues that this would be the wrong path here. Defendant's position is that the Court should decline to consider Plaintiff's affidavit as part of its calculus, because the affidavit is "self-serving and wholly speculative" and therefore cannot provide sufficient facts to place the agreement to arbitrate at issue. For the following reasons, the Court disagrees.

In support of its argument that this is a "self-serving and conclusory" affidavit, Defendant primarily cites to this Court's decision in *Home Buyers Warranty Corp. v. Jones*, C.A. No. 15-mc-324-RGA-MPT, 2016 WL 2350103, at *4 (D. Del. May 4, 2016), *adopted as clarified by* 2016 WL 3457006 (D. Del. June 21, 2016). (D.I. 9 at 5) Yet *Home Buyers Warranty Corp.* is different in important respects from the case here.

In *Home Buyers Warranty Corp.*, the respondents, who were purchasing a home, executed a sales agreement with the seller; paragraph eight of the sales agreement contained a "Limited Warranty" provision. *Home Buyers Warranty Corp.*, 2016 WL 2350103, at *1. The Limited Warranty provision stated that: (1) the seller had provided the respondents with a sample limited warranty document that contained the terms and conditions of a limited warranty that would be provided by the seller to the respondents at closing; (2) the respondents had read and understood this sample limited warranty document; and (3) all disputes arising under the limited warranty were to be submitted to binding arbitration. *Id.* The respondents had also initialed the first page of the sales agreement, which noted the attachment and incorporation of the sample limited warranty document into the agreement. *Id.* at *2, *4. Later, the seller and respondents also executed a "Builder Application for Home Enrollment" form, which included a clause stating that respondents had read a sample warranty and agreed to be bound by the arbitration provision. *Id.* at *2. After respondents subsequently filed a class action complaint against certain entities in Delaware state court relating to their home purchase, certain of those

12

entities ("petitioners") brought suit in this Court, and later moved to compel arbitration of their disputes with respondents, citing to the arbitration provisions described above. *Id.* at *3. Although respondents argued in response that they "never agreed to the arbitration clause[,]" the *Home Buyers Warranty Corp.* Court found that respondents' arguments "fail[ed] to rise above a naked assertion." *Id.* at *4. This was due to the existence of the multiple agreements referenced above—agreements that had indisputably been signed by respondents and that included language indicating that the signatories agreed to be bound by the arbitration provision. *Id.* at *4 & n.3.

In this case, unlike in *Home Buyers Warranty Corp.*, there is no document of record that contains Plaintiff's handwritten signature and that also includes language requiring that certain disputes must be arbitrated. And here, there is also a basic dispute about whether Plaintiff is even the person who electronically executed the acknowledgment (and thus, whether Plaintiff even ever actually received access to or reviewed the Arbitration Agreement in question via a computer).

In the Court's view, the circumstances here are much closer to those in *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009), where the Third Circuit found that a plaintiff's affidavit was sufficient to raise a genuine issue of fact regarding the existence of an agreement to arbitrate. In *Kirleis*, the plaintiff was a shareholder/director at a law firm and she filed multiple employment discrimination-related complaints against the firm. 560 F.3d at 158-59. The law firm filed a motion to compel arbitration, citing a mandatory arbitration provision in its bylaws. *Id.* at 159. The plaintiff, in response, submitted an affidavit in which she stated that she had never previously been provided with a copy of the bylaws and had never signed the bylaws. *Id.* To the contrary, the plaintiff averred that the first time she had seen the bylaws was

during the pendency of her district court case—approximately nine years after she became a shareholder at the law firm. *Id.*

After the district court found that the affidavit sufficed to establish a genuine issue of material fact as to the existence of an agreement to arbitrate, the law firm argued on appeal that the plaintiff's affidavit was "self-serving and conclusory" and thus could not suffice to establish a genuine fact dispute. *Id.* at 161. In responding to this argument, the *Kirleis* Court agreed that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment" and that an affiant must instead "set forth specific facts that reveal a genuine issue of material fact." *Id.* (internal quotation marks and citations omitted). But it explained that the plaintiff's affidavit had satisfied this standard, in that it had "detailed the specific circumstances that rendered the formation of an agreement to arbitrate impossible" (such as the fact that the plaintiff had never been provided with a copy of the bylaws, had never signed an agreement that referred to or incorporated the arbitration provision in the bylaws, and never agreed to arbitrate claims against the law firm). *Id.*; *see also Noye v. Johnson & Johnson*, No. 1:15-cv-2382, 2016 WL 4678999, at *4 (M.D. Pa. Sept. 7, 2016) (denying a motion to compel arbitration and granting the parties limited discovery on the question of arbitrability, where the plaintiff submitted an affidavit (1) explaining that he did not recall signing the arbitration agreement, and (2) noting that while he signed numerous documents provided by defendant with his handwritten signature, the arbitration agreement contained only a typewritten version of his name).

Here, as in *Kirleis*, Plaintiff's affidavit sets forth "specific facts" that detail "the specific circumstances" that are said to have "rendered the agreement to arbitrate impossible." In the affidavit, Plaintiff states that she "did not look at or review" the Arbitration Agreement and any opt-out form, and posits that instead, another store employee "who had access to the Manager's

14

office" could have done so while using Plaintiff's identifying information. (D.I. 8, ex. A at ¶ 5) But Plaintiff does not only make this bare allegation—she also provides some specific facts to support this theory. For example, it is undisputed that one piece of identifying information that was needed to access the DTS arbitration website was an employee "pin number" or "password number." (D.I. 6 at ¶¶ 4, 7; D.I. 9 at 4) Plaintiff explains in her affidavit that, as of the time when she began working at the DTS Dover store, employee password numbers were kept "in a black book . . . in the manager's office" so anyone "who had access to the Manager's office also had access to the black book containing [these] password numbers[.]" (D.I. 8, ex. A at ¶ 4) This fact helps explain how someone other than Plaintiff might have logged in and accessed the arbitration documents at issue. Moreover, Plaintiff also provides additional facts that help show that this "somebody else logged in instead of me" scenario has precedent. In her affidavit, she alleges that: (1) in the past, Ms. Ruiz, a former Assistant Manager, frequently used these unprotected employee passwords to access employees' electronic files (including Plaintiff's files) and to complete surveys and tests on those employees' behalf; and that (2) although Ms. Ruiz had left the store by May 2015, "the black book where she placed [] employee password numbers remained in the Manager's office" such that others could have easily taken similar steps and accessed the arbitration materials in question. (*Id.* at ¶¶ 4-5)[5] Hence Plaintiff's affidavit is

---

[5] Although it recognizes that Plaintiff's affidavit contains these details, Defendant faults the affidavit for failing to include *other* potentially relevant facts. For example, although Plaintiff has explained how some other employee could have found and used Plaintiff's employee password number, Defendant notes that such a person would also have had to enter the last four digits of Plaintiff's Social Security Number in order to get access to the arbitration website, and that Plaintiff "offers no theory as to how her [S]ocial [S]ecurity [N]umber may have been obtained by the unknown third party." (D.I. 9 at 4) And Defendant faults Plaintiff for failing to identify "any individuals [Plaintiff] believed were aware of the location of the pin numbers, as well as other instances where [Plaintiff] believed employees utilized the log book to access pin numbers and log on to Dollar Tree's system." (*Id.* at 5 n.7) It is true that Plaintiff's affidavit might have been more detailed. But the question here is not whether the affidavit could

15

not conclusory; instead, it presents specific factual assertions that call into question whether there was an agreement to arbitrate.[6]

---

have included more facts—any affidavit could. Instead, the question is whether there are *sufficient* facts asserted that help the affidavit rise above the "conclusory" level. For the reasons set out above, the Court concludes that there are.

[6] In support of its Motion, Defendant also cited to numerous opinions involving DTS in which courts have compelled arbitration regarding this very same Arbitration Agreement. (D.I. 5 at 8-9) It argued that, just as those courts did, here the Court should grant its Motion to Compel. (*Id.*)

However, nearly all of the cited cases involved situations where it was not really in serious dispute that the non-moving party had accessed and/or reviewed and/or executed the arbitration agreement in question at some point. *See Hamlin v. Dollar Tree Stores, Inc.*, C.A. No. 2:17-cv-2648-PMD, 2017 WL 6034325, at *1 (D.S.C. Dec. 6, 2017) (granting a motion to compel arbitration where, *inter alia*, DTS presented digital evidence that plaintiff signed the arbitration agreement and plaintiff admitted in her brief that she did sign the agreement); *Moise v. Family Dollar Stores of New York, Inc.*, No. 16-CV-6314 (RA), 2017 WL 2378193, at *3-4 (S.D.N.Y. June 1, 2017) (granting a motion to compel arbitration where there was an electronic record of the date and time when plaintiff reviewed and acknowledged the arbitration agreement, and where although plaintiff did not recall doing this, plaintiff also did not argue that this record was fabricated or inaccurate); *Deleon v. Dollar Tree Stores, Inc.*, 3:16-cv-00767 (CSH), 2017 WL 396535, at *3 (D. Conn. Jan. 30, 2017) (granting a motion to compel arbitration where it was undisputed that plaintiff accessed the arbitration agreement on two occasions); *Taylor v. Dollar Tree*, CAUSE NO. 3:16-CV-2-TLS, 2016 WL 6523442, at *3 (N.D. Ind. Nov. 3, 2016) (granting a motion seeking to compel arbitration, where it was not disputed that the plaintiff accessed the arbitration agreement); *Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 527 (S.D.N.Y. 2015) (granting a motion to compel arbitration where although the plaintiff did not recall signing the arbitration agreement, his electronic signature appeared on the arbitration agreement and plaintiff did not provide any facts beyond his own "bald assertion" to support the conclusion that plaintiff did not review the document). That fact is in real dispute here.

And in those of the cited cases that most closely resemble the current factual posture of this case—i.e., cases where there was some uncertainty as to whether the arbitration agreement was accessed or viewed or signed—courts required further factual development of the record before being able to conclude that the plaintiff had, in fact, taken such steps. *See Herbert v. Dollar Tree Inc.*, Case No. 16-cv-14043, 2017 WL 2472889, at *2 (E.D. Mich. June 8, 2017) (where the plaintiff argued that he never signed the arbitration agreement, the court held an evidentiary hearing on the question, and determined that plaintiff either did so and had forgotten or that plaintiff had otherwise assented to the agreement under the relevant state's law); *see also Wheeler v. Dollar Tree Stores, Inc.*, CIVIL ACTION NO. 6:17-cv-00847, 2017 WL 6813258, at *4-7 (W.D. La. Dec. 14, 2017) (where the plaintiff argued that she never electronically signed the arbitration agreement, but submitted declarations containing facts that were difficult to

16

Therefore, the parties should be entitled to limited discovery relating to the subject of how Plaintiff's identifying information was used to acknowledge access to materials on Defendant's arbitration website (including the Arbitration Agreement and opt-out forms). Such discovery should be helpful in this case to further flush out the facts regarding this key issue. After this discovery is completed, this Court shall provide Defendant with the opportunity to renew its Motion to Compel, which will be judged using the summary judgment standard.[7] *See Guidotti*, 716 F.3d at 776; *see also Silfee*, 696 F. App'x at 578.

## IV. CONCLUSION

For the reasons set out above, the Court DENIES the Motion to Compel without prejudice and ORDERS the parties to proceed through limited discovery as set out above. A separate Order will issue regarding this discovery process.

Dated: July 6, 2018

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

reconcile, the court held an evidentiary hearing, and ultimately determined that plaintiff's testimony was not credible and that defendant's evidence proved that plaintiff had electronically signed the agreement). As in those cases, here there are fact disputes regarding whether Plaintiff ever accessed or reviewed the Arbitration Agreement. Pursuant to Third Circuit law, the Court will order that further factual development of the record occur before a court makes a final determination on the question.

[7] The Court does not address herein step two of the process for determining whether to compel arbitration under the FAA (i.e., whether the merits-based dispute in question falls within the scope of that valid agreement), as Plaintiff does not contest that her claims would fall within the scope of the Arbitration Agreement.