## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBRA ANDRE, )
)
       Plaintiff, )
)
    v. )    Civil Action No. 18-142-MN-CJB
)
DOLLAR TREE STORES, INC., )
)
       Defendant. )

### <u>MEMORANDUM ORDER</u>

Presently pending in this employment discrimination matter is Defendant Dollar Tree Stores, Inc.'s ("DTS" or "Defendant") Renewed Motion to Compel Arbitration (the "Motion"). (D.I. 23) For the reasons set forth below, the Court GRANTS the Motion.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Plaintiff Debra Andre is a resident of Dover, Delaware. (D.I. 1 at ¶ 1; D.I. 10 at 1 n.1) Defendant DTS is a Virginia corporation that operates thousands of retail stores across the nation, in which various retail products are sold. (D.I. 1 at ¶ 2; D.I. 6 at ¶ 3)

Plaintiff was most recently employed by Defendant as Assistant Store Manager ("ASM") at Defendant's retail store #1563, which is located in Dover. (D.I. 1 at ¶ 11; D.I. 24, ex. A at 12) Plaintiff was employed by Defendant from on or about September 2011 until on or about June 30, 2016, at which point Plaintiff's employment was terminated. (D.I. 1 at ¶ 12; D.I. 5 at 1-2)

#### 2.    The Events Leading to Plaintiff's Termination

In her Complaint, Plaintiff alleges that in March 2016, a new Store Manager, Chris Stewart, was assigned to oversee the DTS store where Plaintiff served as ASM. (D.I. 1 at ¶ 14)

1

Approximately two months after Mr. Stewart began working at Plaintiff's assigned store,

Plaintiff received complaints from female and male employees at the store about Mr. Stewart;

the employees asserted that Mr. Stewart made sexual remarks about them or about other workers.

(*Id.* at ¶ 15) Plaintiff then notified (via e-mail) District Manager Marcella Leathern about the

complaints, but Plaintiff did not receive a response. (*Id.* at ¶¶ 16-17)

Approximately a week and a half after Plaintiff sent the e-mail to Ms. Leathern, at a time

when Plaintiff was bent over stocking shelves with another co-worker, Mr. Stewart is alleged to

have grabbed Plaintiff's waist from behind and pulled Plaintiff into his groin while making

sexual remarks. (*Id.* at ¶ 18) Plaintiff again e-mailed Ms. Leathern complaining about Mr.

Stewart's conduct, but once again, Plaintiff did not receive a response from Ms. Leathern. (*Id.* at

¶¶ 19-20)

Approximately two days later, Plaintiff was in a store office when Mr. Stewart reached

towards Plaintiff and grabbed her buttocks, at which point Plaintiff forcibly pushed Mr. Stewart

away. (*Id.* at ¶ 21) Plaintiff once more e-mailed Ms. Leathern complaining about Mr. Stewart's

conduct but again did not receive a response. (*Id.* at ¶¶ 22-23) Plaintiff then reported this

incident to "numerous Human Resource personnel." (*Id.* at ¶ 24)

Approximately one week later, Plaintiff was called into work on her day off to meet with

Ms. Leathern regarding Mr. Stewart's conduct. (*Id.* at ¶ 26) Ms. Leathern explained to Plaintiff

that if Plaintiff had provided any inaccurate facts to Defendant about Mr. Stewart's conduct, then

Plaintiff's employment would be terminated. (*Id.* at ¶ 27)

On another work day in this general time frame, Plaintiff was scheduled to work a 5.5

hour shift. (*Id.* at ¶ 31) Plaintiff alleges that during this shift she was notified by Mr. Stewart

that he was going to be late for work. (*Id.*) Defendant's policy states that an employee will be

2

reprimanded if they do not take a lunch break after six hours of work. (*Id.* at ¶ 30) Realizing that because Mr. Stewart was going to be late for work, this would mean that Plaintiff would be required to work for over six hours on that day, Plaintiff took a 32-minute lunch break on that day. (*Id.* at ¶¶ 29, 31)

On June 30, 2016, Plaintiff alleges that she was terminated for taking this "unscheduled lunch break." (*Id.* at ¶¶ 12, 33; *see also* D.I. 5 at 2) Plaintiff contends that this reason proffered by Defendant for her firing (i.e., that Plaintiff was fired because she took the unscheduled lunch break) is pretextual; instead, Plaintiff asserts that she was really terminated due to discriminatory and retaliatory conduct on the basis of her sex, stemming from the incidents described above regarding Mr. Stewart. (D.I. 1 at ¶ 35)

### 3. The Arbitration Program and the Arbitration Agreement

In 2014, during the term of Plaintiff's employment, Defendant implemented its Arbitration Program; the program was officially introduced to Store Managers on February 23, 2015. (D.I. 24 at 3; *id.*, ex. C; *see also id.*, ex. B at 46) At this time, the Store Manager at Plaintiff's store was Frank Smith. (*Id.*, ex. B at 46) Mr. Smith received an e-mail explaining the program from DTS's President on this date. (*Id.*, ex. C)

DTS Associates hired on or after October 6, 2014 were required to participate in the Arbitration Program as a condition of their employment. (D.I. 27 at ¶ 4) Those Associates were provided with a Mutual Agreement to Arbitrate Claims (hereinafter, the "Arbitration Agreement") during their onboarding process with DTS. (*Id.*) However, all Associates hired before October 6, 2014 (like Plaintiff) were provided with the option of opting out of the Arbitration Program. (*Id.* at ¶ 5) To do so, an Associate was required to submit an opt-out form either electronically or by mail, prior to May 31, 2015. (*Id.*; *see also id.*, ex. 2 at 4)

3

The Arbitration Agreement provides, *inter alia*:

> The Parties agree to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, that can be raised under applicable federal, state, or local law, arising out of or related to Associate's employment (or its termination), that . . . the Associate may have against . . . Dollar Tree . . . . Claims subject to arbitration include but are not limited to, claims for: . . . retaliation or discrimination (including, but not limited to, . . . sex . . . .)[.]

(D.I. 27, ex. 2 at 1) Moreover, the Arbitration Agreement provides that it survives the termination of an associate's employment and that it constitutes the full and complete agreement pertaining to the formal resolution of disputes between parties. (*Id.* at 4) The opt-out procedure is also set out in the Arbitration Agreement, which states that "**Associate must opt out by May 31, 2015. Associate's decision not to opt out by May 31, 2015 constitutes Associate's assent to, and agreement to be bound by, this Agreement.**" (*Id.* (emphasis in original))

The arbitration materials, including the Arbitration Agreement and information on how to opt out of the agreement ("arbitration materials"), were located on a DTS arbitration website. In order to access that website, each Associate was required to input his or her name, the last 4 digits of his or her Social Security Number, his or her Employee ID number (also referred to as a "time clock ID") or Compass ID,[1] his or her store number, and his or her work address. (D.I. 27 at ¶ 9; *see also id.*, ex. 5) Once these credentials were submitted electronically, a "pop-up box" appeared, stating that by clicking on the "Review Documents" button, the Associate was acknowledging that they had been provided with access to the Arbitration Agreement, opt-out instructions, and other important information about arbitration. (D.I. 27 at ¶ 9; *id.*, ex. 5) After then being prompted to and clicking on a "Continue" box, the Associate would be directed to

---

[1]     Each DTS Associate is issued a numeric Employee ID and password that are used to clock in and out from work, as well as a Compass ID and password that is used to log in for training on Defendant's iLearn computer system. (D.I. 27 at 3 n.2)

DTS's "Arbitration home page"—a page with links to, *inter alia*, the Arbitration Agreement and opt-out information. (D.I. 27 at ¶ 10; *see also id.*, ex. 6)  With regard to opt-out information, the Arbitration home page included a bolded heading titled "Opting Out of Arbitration[;]" that section explained that for DTS employees hired before October 6, 2014 who did not wish to participate in arbitration, the employee should either file an Electronic Opt-Out Form online or a Printable Opt-Out Form that would be mailed to the corporate office.  (*Id.*, ex. 6)  The home page provided hyperlinks to these forms, emphasized that the deadline for opting out was May 31, 2015 and explained that if an employee did not opt out by that date, they were agreeing to arbitration.  (*Id.*)

On April 6, 2015 at 12:51 p.m. each DTS Store Manager, including Mr. Smith, was notified by e-mail that the Arbitration Program was now being rolled out to hourly Associates (like Plaintiff) who were hired before October 6, 2014.  (D.I. 27 at ¶ 6; *see also id.*, ex. 1)  This e-mail explained that such Associates were required to:  (1) review the arbitration materials, including the Arbitration Agreement, prior to April 17, 2015; and (2) do so on a DTS store computer while on the clock during regular work hours.  (*Id.*, ex. 1)  The e-mail also provided Smith with:  (1) a list of his store's employees who had to review and acknowledge the materials; (2) a set of instructions for Store Managers to help them ensure that Associates acknowledged receipt of the materials; and (3) a flyer about the Arbitration Program (which contained instructions about the opt-out procedures, including the opt-out deadline) that could be posted in an associate break area in the store.  (*Id.*, ex. 1 & Attachment C)

### 4. Evidence Relating to Plaintiff's Engagement with the Arbitration Website and Arbitration Materials

Mr. Smith testified that after he received the April 6, 2015 e-mail, he spoke to his three ASMs (including Plaintiff) about the rollout of the Arbitration Program.  (D.I. 24, ex. B at 49-50,

52) Mr. Smith stated that he believes that he also took other steps to inform store Associates, including the ASMs, about the program, including: (1) placing a copy of the flyer in a hanging sleeve system in the Store Manager's office (which he and ASMs frequently accessed); (2) communicating with ASMs on an in-store messaging program about the need to have Associates review the arbitration materials; and (3) hanging the flyer in the store break room. (*Id.* at 53-55, 60, 62-63)

Defendant provided company records indicating that on April 6, 2015 (the same day as Mr. Smith was advised to begin rolling out the Arbitration Program to employees hired before October 6, 2014), Plaintiff acknowledged accessing the arbitration website and being provided with access to the Arbitration Agreement and opt-out forms. More specifically, Defendant provided a one-page acknowledgement form ("the acknowledgement") that reads as follows:

> You [debra andre] electronically acknowledged on 04/06/2015 that Dollar Tree gave you the opportunity to read the Arbitration Agreement and other important information relating to Dollar Tree's arbitration program.
>
> Store Number: 01563
> Work Address:
> City: dover
> State: DE
> Zip Code: 19901

(D.I. 27, ex. 2 at final page) Defendant also provided a document containing raw data that was pulled from a company server regarding this acknowledgement. (D.I. 27 at ¶ 12) This document has columns representing: (1) the date and time an event occurred ("with time being a constant Eastern Standard Time ['EST'] regardless of location or time of year"); (2) the IP address of the computer used to access the arbitration website; (3) the nature of the access; (4) a description of what was being accessed; (5) the first and last name of the Associate accessing the website; (6) the last four digits of that employee's Social Security Number; (7) the Associate's Employee ID

6

number or the Associate's Compass ID and store number; (8) the city and state in which the store is located along with its zip code; and (9) an indication of whether the Associate was hired prior to October 6, 2014 or not. (*Id.*) The document indicates that "Debra Andre" logged into the DTS arbitration website on April 6, 2015 at "16:28" (or 4:28 p.m. EST). (*Id.* at ¶ 14 & ex. 7) But Defendant's Field Labor and Budget Director Steven Pearson explains in a declaration that "in 2015, most of the United States, including Delaware had switched to Daylight Saving Time ["DST"] on March 8[, 2015,] [t]hus, the time Debra Andre acknowledged the Arbitration Agreement was actually 17:28 DST [or 5:28 p.m.] on April 6, 2015." (D.I. 27 at ¶ 12)

According to store Compass timekeeping records and other evidence, four DTS employees were working in Plaintiff's DTS store at or around the time of this acknowledgement: (1) Plaintiff (who worked from 5:08 p.m. to 10:48 p.m.); (2) Mr. Smith (who worked from approximately 7:30 a.m. to 6:00 p.m.);[2] cashier Shani Stone (who worked from 12:30 p.m. to 5:41 p.m.) and cashier Loretta Little (who worked from 5:30 p.m. to 10:48 p.m.). (*Id.* at ¶¶ 16-17 & ex. 10) DTS policy prohibits DTS Associates from performing any work without being "clocked in[;]" doing so can lead to an employee's termination. (D.I. 27 at ¶ 18; *see also* D.I. 24, ex. F at 29) Thus, Mr. Pearson avers that he is "confident that the only Associates working [at the store] on April 6, 2015 at 5:28 p.m. were" Mr. Smith, Plaintiff, and Ms. Stone. (D.I. 27 at ¶ 18; *see also* D.I. 24, ex. B at 66 (Mr. Smith stating that working off of the clock was forbidden);

---

[2]     Unlike the situation with the other employees listed in this paragraph, there are not Compass timekeeping records establishing Mr. Smith's work hours on April 6, 2015. That is because DTS Store Managers do not clock in and out on the Compass timekeeping system. (D.I. 27 at ¶ 16) Mr. Smith testified that he always worked through to the end of his scheduled shift, (D.I. 24, ex. B at 73), and his shift on this day ran from 7:30 a.m. to 6:00 p.m., (D.I. 27 at ¶ 16 & ex. 10).

D.I. 25 at ¶¶ 10-11 (Ms. Stone averring that she clocked in at the start of her shift and, to her knowledge, other Associates did the same); D.I. 26 at ¶ 8 (Ms. Little stating the same))

In an affidavit she filed earlier in this litigation, (D.I. 8, ex. A), Plaintiff stated that she was not the person who, on April 6, 2015, accessed the DTS arbitration website and triggered the completion of the acknowledgement. In that affidavit, Plaintiff asserted that she never had an opportunity to read and review the Arbitration Agreement or any opt-out forms that were posted in her employee electronic file. (*Id.* at ¶ 3) Instead, Plaintiff contended that any employees "who had access to the Manager's office [at the DTS store where she worked] also had access to" a book containing employee passwords; this access, according to Plaintiff, gave such employees access to Plaintiff's electronic employment files. (*Id.* at ¶ 4) For example, Plaintiff asserted that Sandy Ruiz, a former ASM at the store, frequently accessed Plaintiff's employee electronic account so that Ms. Ruiz could perform surveys and tests for Plaintiff (instead of Plaintiff personally completing those surveys and tests). (*Id.*) Plaintiff explained that Ms. Ruiz did this because the Store Manager at the time felt it would be more productive for Plaintiff to be on the store floor, instead of taking the time out of her work day to complete these computer-based tasks. (*Id.*) Plaintiff asserted in the affidavit that "any number of persons could have and probably did go into [her] employee electronic file and may have clicked on any number of items posted by Defendant, including . . . the [A]rbitration [A]greement . . . ." (*Id.* at ¶ 5) Plaintiff further stated that "[she] did not actually look at or review items posted by Defendant in [her] employee electronic file either on line or in person, including . . . the [A]rbitration [A]greement and any opt-out form." (*Id.*)

The other three DTS employees known to be working at Plaintiff's store on April 6, 2015—Mr. Smith, Ms. Stone and Ms. Little—have thereafter denied using Plaintiff's identifying

information and employee credentials to access the arbitration website on that date. In a deposition, Mr. Smith denied doing so and said he is unaware of any other DTS employee engaging in such actions. (D.I. 24, ex. B at 58-59) In an affidavit she filed, Ms. Stone states that while working at that store, she "did not know, or have access to or use, the confidential personnel information of other Dollar Tree employees . . . [and did] not know if confidential personnel information was kept in the Store Manager's office, let alone where it might have been kept." (D.I. 25 at ¶ 8) Ms. Stone states that while she does not remember the Arbitration Program well, she does remember that she never completed an Arbitration Agreement for any other employee (e.g., by using another employee's credentials to log into the DTS arbitration website), including Plaintiff; Ms. Stone knows that it would have been against DTS policy to have done so. (*Id.* at ¶¶ 15, 17) Ms. Little also filed an affidavit, and in it she also avers that although she does not remember the Arbitration Program specifically, she never accessed Plaintiff's or any other employee's login credentials, and does not have knowledge of any employee who did. (D.I. 26 at ¶¶ 9, 11-13)

Defendant has no record of Plaintiff ever opting out of the Arbitration Agreement by the May 31, 2015 deadline (or at any other time). (D.I. 27 at ¶ 15)

### B. Procedural History

On January 25, 2018, Plaintiff filed this action, alleging that DTS subjected her to sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (D.I. 1 at ¶¶ 6, 34-36, 39-42) In response, on February 15, 2018, Defendant filed a motion to compel arbitration. (D.I. 4) On July 6, 2018, the Court denied that motion without prejudice, and the parties were ordered to proceed through limited discovery regarding the motion. (D.I. 10 at 17)

After the parties engaged in such discovery (with Defendant taking some discovery and Plaintiff taking none), (D.I. 28 at 1; D.I. 29 at 1-2), on December 14, 2018, Defendant filed the instant Motion. (D.I. 23) With this Motion, Defendant again asks the Court to: (1) compel Plaintiff to arbitrate the claims she asserts in this action; and (2) stay this case pending arbitration. (*Id.*) The Motion was fully briefed as of January 18, 2019. (D.I. 29)[3]

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), which governs the Arbitration Agreement in question here, was enacted by Congress in 1925 to quell historical judicial hostility toward the enforcement of arbitration agreements. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12 (2001); *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177-78 (3d Cir. 2010). The United States Court of Appeals for the Third Circuit has "repeatedly recognized that the [FAA] establishes a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 200 (3d Cir. 2010) (quoting *Puleo*, 605 F.3d at 178).

Pursuant to Section 3 of the FAA, a court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. Section 3, thus, "requires the court, on application of one of the parties [to the litigation], to stay the action if it involves an issue referable to arbitration under an agreement in writing." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (internal quotation marks and citation omitted); *see also Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he statute clearly states, without

---

[3]    This case has been referred to the Court by District Judge Maryellen Noreika for all purposes up to and including the resolution of case-dispositive motions. (D.I. 13)

10

exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until the arbitration has been concluded.").

However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). Therefore, a party may not be compelled under the FAA to submit to arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original). Thus, in deciding whether to compel arbitration under the FAA, a court first considers (1) whether there is a valid arbitration agreement between the parties, and if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement. *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998).

With respect to the first inquiry (or "step one"), courts apply "ordinary state-law principles that govern the formation of contracts." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009); *see also Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 500 (D. Del. 2010). In examining this question, if the affirmative defense of arbitrability is apparent on the face of the complaint (or documents relied upon therein), a court utilizes "a motion to dismiss standard without the inherent delay of discovery[.]" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) (internal quotation marks and citation omitted). If, however, the complaint does not establish on its face an agreement to arbitrate, or if the party opposing the motion to compel arbitration thereafter comes forward with "reliable evidence that is more than a naked assertion . . . that it did not intend to be

bound by the arbitration agreement" in question, then a court utilizes a summary judgment standard to resolve the issue. *Id.* (internal quotation marks and citation omitted).[4] In utilizing the summary judgment standard, a court assesses whether there is a genuine issue of material fact as to whether the parties entered into such an arbitration agreement, and, in doing so, gives the opposing party the benefit of all reasonable doubts and inferences that may arise. *Id.*; *see also Vilches v. Travelers Cos.*, 413 F. App'x 487, 490-91 (3d Cir. 2011).

If a complaint does not itself establish an agreement to arbitrate, or if the non-movant has come forward with reliable evidence that calls into question whether he or she intended to be bound by an arbitration agreement, then the "non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (internal quotation marks and citations omitted). If limited discovery is provided, the court may thereafter entertain a renewed motion to compel arbitration, judging the motion under the applicable summary judgment standard. *Id.* at 776. If a genuine issue of material fact does then exist as to whether there was an agreement to arbitrate, this precludes the grant of a motion seeking to compel arbitration. *Id.*; *Century Indem. Co.*, 584 F.3d at 528. A trial is then required to determine whether an arbitration agreement exists. *Guidotti*, 716 F.3d at 776; *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007); *see also* 9 U.S.C. § 4. On the other hand, if at this stage a determination as to whether an arbitration agreement formed will not turn on material disputed issues of fact (and instead only "involves

---

[4]    The use of a summary judgment standard in such scenarios is appropriate because an order compelling arbitration in this context is "in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Century Indem. Co.*, 584 F.3d at 528 (internal quotation marks and citation omitted).

contract construction" issues), the Court then simply makes a legal determination, using the aforementioned state law principles. *Century Indem. Co.*, 584 F.3d at 528-30.

With regard to the step two question—whether the dispute between the parties falls within the scope of the valid arbitration agreement—the court utilizes federal law. *Id.* at 524. Pursuant to the FAA and federal policy, there is a presumption in favor of arbitration "[i]n determining whether the particular dispute falls within a valid arbitration agreement's scope[.]" *Id.*; *see also Cohen*, 750 F. Supp. 2d at 501. Thus, an "'order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT&T Techs., Inc.*, 475 U.S. at 650).

## III. DISCUSSION

In challenging the Motion, Plaintiff focuses on step one of the arbitration inquiry described above—that is, she argues that no valid arbitration agreement exists here between the parties. In support of her challenge, Plaintiff first argues that there is at least a genuine issue of material fact as to whether she is the person who accessed Defendant's arbitration website using Plaintiff's credentials on April 6, 2015 (and thus, as to whether Plaintiff was ever provided with access to the Arbitration Agreement and opt-out procedures). (D.I. 28 at 10-14) Next, Plaintiff asserts that even if she did access the arbitration materials at issue in April 2015, she still did not agree to arbitrate the instant claims, because there is no evidence that she ever actually read or understood the Arbitration Agreement or its opt-out provisions. (*Id.* at 14-16) The Court will address these issues in turn.

### A. Is There a Genuine Issue of Material Fact as to Whether Plaintiff Gained Access to the Arbitration Materials on April 6, 2015?

In asserting that there can be no genuine dispute of fact that it was Plaintiff who gained access to the arbitration materials on Defendant's arbitration website on April 6, 2015, Defendant makes three primary arguments. The Court finds each of those arguments compelling and firmly supported by the factual record. And it finds Plaintiff's countervailing assertions as to each of those arguments to be unpersuasive. Below, the Court will address each of the three lines of argument and explain why they support Defendant's Motion.

First Defendant points to DTS company records, which establish that Plaintiff's credentials were used to access the arbitration materials on the day in question. On their face, these records indicate that on April 6, 2015 at 16:28 p.m. EST (or 4:28 p.m.), someone used Plaintiff's name, the last four digits of her Social Security Number, her time clock ID number, her store number and her work address to access the website and complete the acknowledgement. (D.I. 27 at ¶ 12; *id.*, ex. 2 at final page; *id.*, ex. 7) Now, the time of that login is potentially problematic for Defendant, since Compass timekeeping records do not show Plaintiff logging in to work until 5:08 p.m. on this date. (D.I. 27 at ¶ 12; *id.*, ex. 10) But Defendant has explained that potential discrepancy by noting that the timekeeping system at issue uses a constant EST designation regardless of the time of the year; thus, since on April 6, 2015, the East Coast of the United States had switched to Daylight Savings Time, the "16:28" time stamp at issue actually indicates that Plaintiff's credentials were utilized at 5:28 p.m. (D.I. 27 at ¶ 12)

In response, Plaintiff seizes on this time-stamp discrepancy. In her briefing, she argues that Defendant's explanation for this "anomaly" is not believable, in that it "requires the Court to believe that Dollar Tree computers, unlike most modern computers, are incapable of adjusting for Daylight Savings Time, or, if Dollar Tree [c]omputers do not automatically adjust for

14

Daylight Savings Time, that no manual adjustment was made for over a month [i.e., from March 2015 when Daylight Savings Time took effect to April 6, 2015]." (D.I. 28 at 12)

The Court's view is that the discrepancy in the time stamp does not create a genuine issue of material fact. Defendant's explanation for the discrepancy, provided by Mr. Pearson, is an understandable and plausible one. (*See* D.I. 29 at 3 n.2) And more importantly, if there truly was a basis to question the accuracy or reliability of that explanation, Plaintiff had the tools to make that case. That is, Plaintiff had the opportunity in discovery to depose Mr. Pearson as to what DTS records, relating to this subject, did or did not show. (D.I. 29 at 3) But Plaintiff did not do so. Mr. Pearson's explanation for the discrepancy thus stands factually un-rebutted.

Therefore, there is clear evidence that: (1) someone used Plaintiff's credentials and identifying information to log in to Defendant's arbitration website on April 6, 2015; and (2) that person did so at a time when Plaintiff was in her DTS store and on the clock. As a general matter, when an employee's personal identifying information is used to access a company website (at a time when the employee was working), this suggests that the employee him or herself was doing the accessing. Thus, this piece of evidence is a very good place for Defendant to start.

Second, Defendant persuasively demonstrates how the evidence shows that there were only a few persons other than Plaintiff in the DTS store at issue on April 6, 2015 at 5:28 p.m.— and how none of those persons accessed the arbitration website using Plaintiff's credentials. In this regard, Defendant notes that Compass timekeeping records show that Ms. Stone, a cashier, and Store Manager Mr. Smith were the only two other employees working as of 5:28 p.m. on April 6, 2015 (another cashier, Ms. Little, did not clock in until two minutes later, at 5:30 p.m.). (D.I. 24 at 11) Ms. Stone, Ms. Little and Mr. Smith all unequivocally denied, by way of sworn

15

testimony or affidavit, having ever accessed Plaintiff's login credentials or information. (*Id.* at 11-12)[5]

Of course, in her previously-submitted affidavit, Plaintiff also denied that *she* was the person who accessed Defendant's arbitration website. (D.I. 8, ex. A) And Plaintiff stated in that affidavit that: (1) DTS Employee ID numbers were kept in a "black book" in the Store Manager's office and (2) thus, "anyone who had access to the Manager's office" had access to that black book and "*could have and probably did*" use that information to access the arbitration website on April 6, 2015. (*Id.* at ¶¶ 4-5 (emphasis added)) In its prior Memorandum Order, the Court found that these aspects of Plaintiff's affidavit created enough of a factual dispute to warrant the grant of additional discovery on the issue.

That discovery is now completed, however. And the record on this issue is much further developed—and much less favorable to Plaintiff.

For example, in her deposition, Plaintiff was directly asked who she thinks accessed the DTS arbitration website using Plaintiff's credentials on the date in question. (D.I. 24, ex. A at 68) To this, Plaintiff answered "I'm not sure[,]" and stated that she did not "have a position" on that issue. (*Id.*; *see also id.* at 69 (Plaintiff agreeing that as of the date of the deposition, she "[did not] have a position [] or thought today" as to who accessed the website)) Plaintiff then was asked about her previously-submitted affidavit, in which Plaintiff denied having been the

---

5        In her briefing, Plaintiff suggests that the fact that Ms. Little and Ms. Stone did not recall the Arbitration Program (or recall having accessed related arbitration materials in 2015) casts doubt on Defendant's position. (D.I. 28 at 13-14) The Court disagrees. As Defendant notes, there is "nothing inconsistent about not recalling the Arbitration Program [which had been rolled out nearly four years prior to the submission of Ms. Little and Ms. Stone's affidavits] but also adamantly denying violating Dollar Tree policy by utilizing an Assistant Store Manager's personal credentials to generate an Acknowledgement of legal materials on behalf of the Assistant Store Manager for the Arbitration Program." (D.I. 29 at 4)

person who accessed the website. To that line of questioning, however, Plaintiff responded that she did not remember having previously signed the affidavit, nor did she remember its contents. (*Id*. at 69-71) And when again asked whether she had an opinion as to who might have accessed the DTS arbitration website on her behalf, she said that she did not. (*Id*., ex. A at 71 (Plaintiff confirming that, although she believes that in instances prior to April 6, 2015 store employees used her credentials on DTS computers, she did not currently have an opinion on who might have accessed the arbitration website on her behalf on April 6, 2015)) This deposition testimony, which is much more equivocal than was Plaintiff's affidavit, significantly dilutes the force of Plaintiff's previous assertions in that affidavit.

Moreover, with regard to the "black book" that Plaintiff referenced in that affidavit, the facts developed during discovery are also not favorable to Plaintiff. In her deposition, Plaintiff explained that the book was created by a prior Store Manager, Kristin Nichols, and that Ms. Nichols and other managers (including Plaintiff) kept Employee IDs, Compass credentials, passwords and (at least in Plaintiff's case) the last four digits of their Social Security Numbers in the book. (*Id*. at 34-39, 41, 73, 86) Ms. Nichols was fired by DTS in 2014, (*id*. at 32), and as of April 2015, Mr. Smith was the Store Manager at Plaintiff's store. Plaintiff asserts that the "black book" was still in existence when Mr. Smith became the Store Manager. (D.I. 24, ex. A at 33, 45; *see also* D.I. 8, ex. A at ¶ 5 ("In May 2015 . . . the black book . . . remained in the Manager's office of the Dollar Tree Store."))

Yet for his part, while Mr. Smith testified that he recalled that the store had a "black book" during his time as Store Manager, and that while there were "notebooks in [his] office that had some shortcuts for policies and procedures" such as "how to access Compass[,]" Mr. Smith said that he never really looked at any of those books. (D.I. 24, ex. B at 27-28, 44-45) Mr.

17

Smith stated that if he had known that any such books had included any confidential information of employees, he would have gotten rid of that information. (*Id.* at 44-45) And for their parts, Ms. Stone and Ms. Little confirmed that: (1) they were not aware of whether any confidential personnel information was kept in the Store Manager's Office during Mr. Smith's tenure (i.e., in a "black book"); and (2) if there was, they did not and could not have accessed that information. (D.I. 25 at ¶¶ 4-8, 15; D.I. 26 at ¶¶ 5-6, 11)[6]

In sum, there is now a more full, detailed picture of who appears to have been in Plaintiff's DTS store on the day in question and what they did. That record indicates the following:

- There is no evidence that any employee other than Mr. Smith, Ms. Little, Ms. Stone and Plaintiff were in the store at or near the time of the acknowledgement.

- The three employees who were present other than Plaintiff (Mr. Smith, Ms. Little and Ms. Stone) all clearly and firmly deny that they used Plaintiff's credentials to log in to the website on that day.

- Ms. Little and Ms. Stone aver that they did not even have access to the Store Manager's Office and did not know whether any employee personnel information was kept there (such that, if this were correct, it is hard to see how the two cashiers could have even accessed the "black book" that Plaintiff references, or have used it to generate the acknowledgement).

- Even if the "black book" did still exist during his tenure as Store Manager, Mr. Smith states that he was not aware that it contained confidential information of employees; if he had been, he would have destroyed it.

- In a deposition occurring subsequent to the filing of her original affidavit, Plaintiff was unable to offer any type of credible explanation of what she now thinks happened—i.e., who could have accessed the website other than her. Among other things, she

---

[6]     Defendant asserts that this "black book" has not been located, despite attempts by Defendant to look for it. (D.I. 24 at 14 n.13)

18

does not provide a credible explanation for *why* two cashiers or the Store Manager would have done this.[7] And Plaintiff repeatedly indicated that she does not now have an opinion as to who might have done this.

In light of all of this evidence, the Court agrees with Defendant that any remaining assertion by Plaintiff that someone else "could have and probably did" log in by accessing her credentials on April 6, 2015 is unduly speculative. *See Uszak v. AT&T Mobility Servs., LLC*, 658 F. App'x. 758, 759, 764 (6th Cir. 2016) (affirming the district court's decision that the plaintiff, and not another employee on the plaintiff's behalf, had received an e-mail containing an arbitration agreement on three separate occasions, accessed those e-mails, and electronically confirmed viewing the arbitration materials by checking the "Review Completed" box); *Winters v. AT&T Mobility Servs., LLC*, Case No. 4:17-cv-04053-SLD-JEH, 2017 WL 2936800, at *2-4 (C.D. Ill. July 10, 2017) (finding that the plaintiff's theory that another employee utilized her password to log in to her account and acknowledge having been given access to an arbitration agreement was without merit, because plaintiff offered no evidence or support for why or how another employee would have used the plaintiff's credentials to view an e-mail containing the arbitration information, have clicked the link to view the contract, and checked a box as confirmation that

---

[7] In her affidavit, Plaintiff had stated that prior to April 2015, an ASM at the store had "frequently accessed my employee electronic account so she could perform [] surveys and tests for me instead of my personally performing them since the store manager felt I was more productive on the floor and this was a much more efficient use of my time." (D.I. 8, ex. A at ¶ 4) Yet the ASM Plaintiff was referring to there (Sandy Ruiz) was not working in the store on April 6, 2015. Additionally, if this rationale (a store manager logging in for Plaintiff, to keep Plaintiff on the store floor) was the reason why someone logged on to the arbitration website for Plaintiff on April 6, 2015, it could not implicate Ms. Stone or Ms. Little, as they were not in a supervisory position vis-à-vis Plaintiff. It *might* be a reason why Mr. Smith could have been the person who logged in on Plaintiff's behalf—but in her deposition, Plaintiff did not accuse Mr. Smith of having done so. (D.I. 24, ex. A at 69-72) (Defendant notes that at present, Plaintiff and Mr. Smith are in a romantic relationship and that they live together.). (D.I. 24, ex. A at 9; *id.*, ex. B at 82) And the other evidence of record, set out above, does not credibly indicate that Mr. Smith would have or could have done this.

the contract had been viewed); *cf. Gupta v. Morgan Stanley Smith Barney, LLC*, Case No. 17 C
8375, 2018 WL 2130434, at *2-3 (N.D. Ill. May 9, 2018) (finding that the plaintiff's sworn
declaration that he had not received an arbitration agreement with opt-out language created an
issue of fact that warranted a trial, but in a case where there was no electronic acknowledgment
that the plaintiff had received notice of the agreement via e-mail, where defendant could not
show that the plaintiff had opened the e-mail in question, and where there was a potential
discrepancy as to whether the e-mail was sent to the correct address.)

Third, Defendant notes that the timing of Plaintiff's accessing the arbitration website
makes logical sense. More specifically, the evidence shows that: (1) Mr. Smith received the e-
mail that rolled out the DTS Arbitration Program at 12:51 p.m. on April 6, 2015; (2) Plaintiff
clocked in at 5:08 p.m. that day; and (3) Plaintiff accessed the arbitration website at 5:28 p.m. on
that same day. (D.I. 24 at 11) What happened, then, seems understandable and fairly
straightforward: once Plaintiff arrived at the store on the day in question, Mr. Smith did what the
DTS roll-out e-mail instructed him to do (i.e., he informed Plaintiff about the Arbitration
Program and encouraged her to access the website) and Plaintiff did so at the beginning of her
shift. (*Id.*, ex. B at 49-50, 52 (Mr. Smith stating that he recalls holding a meeting where he spoke
to his ASMs about the Arbitration Program))

Plaintiff counters in her briefing by arguing that this timeline seems suspicious. That is,
she argues that that the time period between 5:08 p.m. (when Plaintiff clocked in) and 5:28 p.m.
(when evidence suggests that she reviewed the arbitration materials) is too short a period of time
for Plaintiff to have "show[n up] for work, log[ged] into the cash register to start her time, [be]
briefed by Smith on the rollout of the Arbitration Program and . . . to complete review of the
Arbitration Materials[.]" (D.I. 28 at 13) In the Court's view, however, this 20-minute window

seems like plenty of time for Plaintiff to have completed these few tasks. And (more importantly) Plaintiff points to nothing in the record to suggest that such an inference is unreasonable.[8]

For all of these reasons, there can be no genuine dispute of material fact as to the question of who used Plaintiff's credentials to access Defendant's arbitration website on April 6, 2015. The only reasonable conclusion that a factfinder could draw is that it was Plaintiff who did so.

## B. Did Plaintiff Thus Consent to the Arbitration Agreement Based on Her Silence and Failure to Opt Out?

Plaintiff makes a further legal argument as to why the Motion should be denied—i.e., she argues that the act of logging into the arbitration website (and thus being provided only with the opportunity to read the Arbitration Agreement and other arbitration materials, including the rules regarding opt-out procedures) does not amount to an agreement to arbitrate. (D.I. 28 at 14-15) She notes that at "no time did the person acknowledging the Arbitration Materials represent *that they had actually read* the materials or *that they understood* that a contract was being formed[;]" thus, she argues that pursuant to Delaware state law (which the parties agree applies here), such "silence or inaction will generally not operate as acceptance." (*Id.* at 15 (emphasis added))

Under Delaware law, a contract exists if a reasonable person would conclude, based on the objective manifestations of assent and surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms. *See Patel v. Patel*, C.A. No. 07C-07-020 RRC, 2009 WL 427977, at *3 (Del. Super. Ct. Feb. 20, 2009); *Leeds v. First Allied Ct. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986). Delaware law, following the Restatement (Second) of

---

[8]     For example, Plaintiff did not submit a declaration asserting that it would have been difficult or impossible for her to have completed these tasks in the relevant time frame. (D.I. 29 at 3 n.3)

Contracts, also states there are three scenarios under which an offeree's silence and inaction operate to manifest consent or acceptance to a contract's terms:

> [1] Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.[;]
>
> [2] Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.[; and]
>
> [3] Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intent to accept.

*Brittingham v. Bd. of Adjustment of City of Rehoboth Beach,* No. Civ.A. 03A-08-002, 2005 WL 170690, at *5 (Del. Super. Ct. Jan. 14, 2005) (quoting Restatement (Second) Contracts § 69 (Am. Law Inst. 1981)).

This is a case where at least the second exception referenced above is applicable. That is, here the offeror (Defendant) stated or gave the offeree (Plaintiff) reason to understand that her assent to participate in the Arbitration Program would be manifested by silence or inaction (i.e., by failing to opt out by May 31, 2015), and the offeree (Plaintiff) then remained silent and inactive thereafter, indicating an intent to accept the offer. As is noted above, in light of the current record, there can be no material dispute of fact that it was Plaintiff who used her credentials to access Defendant's arbitration website on April 6, 2015. When Plaintiff did that, the undisputed evidence of record shows that she was then presented with a "pop-up box" stating that by clicking on a "Review Documents" button, she was acknowledging that Defendant had given her "access to the Arbitration Agreement" and "instructions about how to opt out of (or decline to participate in) arbitration[,]" among other things. (D.I. 27 at ¶ 9; *id.*, ex. 5) Then, after clicking on a "Continue" box, Plaintiff was directed to DTS's "Arbitration home page[,]"

22

which included: (1) a link to the Arbitration Agreement; (2) the statement that if the employee was "hired before October 6, 2014 and [did] not want to arbitrate disputes with Dollar Tree" she could submit an opt-out form (and instructions on how to do so); and (3) a statement that if the employee did not do so "by May 31, 2015 [she would be] agreeing to arbitrate any employment-related disputes that arise." (D.I. 27 at ¶ 10; *id.*, ex. 6)[9]  Defendant has presented evidence that Plaintiff in fact took each of these electronic steps on April 6, 2015, such that she completed the aforementioned acknowledgement process. (D.I. 27 at ¶ 12; *id.*, ex. 2 at final page; *see also* D.I. 24 at 5)  Thus, by being informed about the Arbitration Agreement, the ability to opt out of the agreement and the deadline for opting out—and by not following the opt-out procedures by the opt-out deadline—Plaintiff gave Defendant every reason to believe that she agreed to participate in the Arbitration Program.  This silence or inaction consisted consent or acceptance to the Arbitration Agreement. *See Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7-8 (2d Cir. 2009) (finding that, pursuant to New York law, where a plaintiff/employee received notice of an arbitration program by mail, continued her employment and failed to opt out of the program, the plaintiff had manifested assent to participate in the arbitration program); *Bolden v. AT&T Servs., Inc.* 350 F. Supp. 3d 1029, 1033-36 (D. Kan. 2018) (finding that, pursuant to Kansas law and the Second Restatement, where the evidence demonstrated that the plaintiff received arbitration documents that explained an opt-out procedure, the plaintiff's failure to opt out amounted to silence that equaled an agreement to arbitrate disputes with the defendant, even where the

---

[9]     Defendant also presented evidence that it took other steps to give Plaintiff notice about the Arbitration Program and the opt-out deadline.  This includes Mr. Smith's testimony that he believes that he placed a copy of a flyer describing the program and the deadline in a hanging sleeve system in the Store Manager's office (which he and ASMs frequently accessed) and in the store break room. (D.I. 24, ex. B at 53-55, 62-63)  And it includes Mr. Smith's testimony that he spoke with the ASMs, including Plaintiff, about these subjects after he received the Arbitration Program roll-out e-mail on April 6, 2015. (*Id.* at 49, 52)

plaintiff asserted that she had never read the arbitration materials); *Davis v. Macy's Retail Holds, Inc.*, Civil No. 3:17-cv-1807 (JBA), 2018 WL 4516668, at *5 (D. Conn. Sept. 19, 2018) (finding that, pursuant to Connecticut law and the Second Restatement, where a plaintiff signed an acknowledgement form reflecting his understanding that if he did nothing and did not return an opt-out form, he would be agreeing to resolve future disputes in arbitration, this amounted to inaction that constituted acceptance); *cf. Taylor v. Dollar Tree*, CAUSE NO.: 3:16-CV-2-TLS, 2016 WL 6523442, at *2-4 (N.D. Ind. Nov. 3, 2016) (applying Indiana state law and concluding that the plaintiff entered into a valid agreement to arbitrate with defendant DTS, where the plaintiff electronically accessed information regarding DTS's Arbitration Program, including the Arbitration Agreement, but did not exercise his right to opt out of the agreement by the May 31, 2015 deadline).

### C. Conclusion

In conclusion, the Court finds that there is no genuine issue of material fact on the question of whether Plaintiff was the person who accessed Defendant's arbitration materials using Plaintiff's own unique credentials. And the Court finds that, as a legal matter, Plaintiff's knowledge of the Arbitration Agreement and the opt-out program and her failure to opt out by the deadline indicated Plaintiff's consent to be bound by the terms of that agreement. As Plaintiff raises no other challenge to the enforcement of the Arbitration Agreement here, the Motion should be granted.

### IV.    CONCLUSION

For the reasons set out above, the Court GRANTS the Motion and ORDERS the parties to arbitrate the claims pursuant to the Arbitration Agreement. The case is STAYED until the completion of the arbitration process. *See* 9 U.S.C. § 3.

24

Dated: June 26, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE